**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-10641

————————————

KATHERINE MARTINEZ,

*Plaintiff-Appellant,*

*versus*

GEICO CASUALTY INSURANCE COMPANY,

*Defendant-Appellee.*

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:23-cv-20219-KMW

————————————

Before LUCK, LAGOA, and ABUDU, Circuit Judges.

LAGOA, CIRCUIT JUDGE:

Katherine Martinez appeals the entry of summary judgment for GEICO Casualty Insurance Co. ("GEICO") on her claim for bad faith under Florida law. Martinez, along with several others, was severely injured in a three-vehicle car collision while riding

as a passenger in her friend's SUV. Diana Guevara, the driver of the truck that struck the SUV, was insured by GEICO. Guevara's insurance policy provided bodily-injury coverage up to $10,000 per person, but no more than $20,000 total per accident. Upon receiving notice of the claim, GEICO flagged a potential coverage issue, as Guevara's truck was not listed as a covered vehicle on her insurance policy. GEICO investigated the coverage issue over the next several weeks and, upon identifying the victims of the crash, requested medical information from them to guide its assessment of their injuries.

Thirty-two days after receiving notice of the claim—and before GEICO had resolved the coverage issue—GEICO informed the crash victims that it had tendered the full $20,000 coverage limit to resolve all claims at a global settlement conference. GEICO proposed that sum be split evenly between Martinez and another passenger. Martinez rejected GEICO's tender offer and instead elected to sue Guevara in state court for the full amount of her damages. After nearly nine years of litigation in state court, Guevara and Martinez reached a stipulated final judgment for $2,000,000. Guevara then assigned her outstanding claims against GEICO to Martinez, who, in turn, sued GEICO in federal court to recover the excess judgment, alleging one count of bad faith.

The district court entered summary judgment for GEICO on that claim, adopting the magistrate judge's finding that "GEICO did not, as a matter of law, act in bad faith." Martinez appeals that ruling, arguing that the "totality" of the evidence, when viewed in

the light most favorable to her, would allow a reasonable jury to infer that GEICO acted in bad faith by delaying its investigation of Guevara's claim and its tender of the policy limit to her.  After careful review and with the benefit of oral argument, we affirm the district court's order granting summary judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On February 12, 2009, Roxanne Morina was driving her mother's Ford Expedition (the "SUV") southbound on Krome Avenue in Miami-Dade County, Florida.  Morina had five passengers in the SUV: Katherine Martinez, Stacy Puerto, Yanitza Morales, Lisandra Morales, and Stephanie Mejia (collectively, the "SUV Victims").  As Morina was making a U-turn, her SUV was rear-ended by a pickup driven by Rene Gonzalez Carranza.  The impact caused the SUV to spin into the northbound lane of Krome Avenue.  The SUV was then struck by a northbound truck driven by Diana Guevara.  Several of the SUV Victims suffered injuries; Mejia and Martinez's injuries were severe enough that they needed to be airlifted to the hospital.

On February 18, Guevara notified GEICO of the accident.  Guevara's insurance policy with GEICO provided bodily-injury coverage up to $10,000 per person, but no more than $20,000 per accident.[1]  Upon receiving notice, GEICO assigned the liability claim to its adjuster, Natalie Orive.  Greg Santini, a claims manager

---

[1] We refer to these as the "individual-coverage limit" and the "aggregate-coverage limit," respectively.

for GEICO, immediately identified a potential coverage issue, as the truck that Guevara was driving at the time of the accident was not listed on her insurance policy. Santini instructed Orive to obtain a copy of the police report confirming the details of the loss, to notify Guevara of the coverage issue and possibility of excess damages, and to contact Guevara's attorney to discuss the claim.

Orive called Guevara's attorney's office and spoke with his assistant later that day. The assistant informed Orive that at least two of the SUV Victims were airlifted to the hospital and that he believed Guevara was not at fault for the accident. Orive told the assistant about the potential coverage issue and the possibility that the claims could exceed the coverage limits. Orive also spoke to Carranza's attorney, who advised Orive that Guevara collided with Morina and Carranza, and that Carranza may have sustained several injuries in the crash.

On February 19, Orive received a letter from Carranza's attorney with an exchange-of-information form attached. The form identified Carranza, Morina, and Guevara as the parties involved in the accident, and noted that Morina had been cited for careless driving. Orive then contacted Morina and Carranza's insurance carriers, Bristol West and State Farm, respectively. Orive learned no new information from State Farm. However, Bristol West's representative told Orive that it had learned from Javier Cruz, Guevara's partner, that Guevara purchased the truck on the day of the accident, that Morina's SUV did not have its lights on at the time of the crash, and that Morina had supposedly admitted fault for the

accident.  Orive tried to call Morina to confirm these details, but she did not answer, and her voicemail inbox was full.  Orive then opened "bodily injury features" for the SUV Victims in the electronic claims system.  GEICO also sent Guevara two letters on February 19: a "reservation of rights" letter noting that the truck she was driving may not be covered by her insurance policy, and a "bodily injury excess" letter, which explained the policy's coverage limits, the possibility that the claims could exceed those limits, her right to contribute personal funds to any claims made against her, and her right to retain an attorney to protect her interest in excess of the policy limits.

On February 20, Santini (the claims manager) instructed Orive to retrieve the bill of sale for Guevara's truck to resolve the coverage issue.  The following day, a Saturday, Orive tasked a GEICO field representative with obtaining the police report from the crash, so GEICO could learn the identities of the SUV Victims and the details of the incident.  The field representative acknowledged the assignment on February 23, the next business day.

GEICO received the police report, which was dated February 12, 2009 (the day of the crash), on March 5.  From reviewing the police report, GEICO was able to identify each of the victims and learn that Martinez, Mejia, Yanitza Morales, Puerto, and Guevara suffered "incapacitating" injuries.  The police report also confirmed that Morina was cited for careless driving.

By March 6, GEICO still had not received the bill of sale from the seller of Guevara's truck.  Accordingly, GEICO conducted

a database search for information on the truck in furtherance of resolving the coverage issue. The search indicated that the truck was registered to a private owner in Hialeah, Florida. Eight days later, on March 14, Orive reached out to Guevara's attorney requesting proof of purchase for the truck.

Although the coverage issued had not been resolved, GEICO referred the case to outside counsel on March 14 to arrange a global settlement conference. That same day, GEICO sent each of the SUV Victims a letter explaining that the most GEICO could pay for an individual claim was $10,000 and no more than $20,000 for all claims presented, and that GEICO was attempting to resolve all claims within the available policy limits. The letter also asked the SUV Victims to attend a global settlement conference and to submit medical documentation to guide GEICO's assessment of the injuries.

To further investigate the extent of those injuries, GEICO sent a field representative to conduct personal interviews with the SUV Victims or their families on March 18. From these visits, GEICO learned that Martinez was still in the hospital and would need eight surgeries after sustaining severe injuries to her right leg, right knee, and pelvis; that Mejia was hospitalized for seven days following the accident and received treatment for a lacerated spleen, a forehead laceration that required 27 stitches, a fractured pelvis, and internal bleeding; that Lisandra Morales suffered extensive bruising on her right shoulder but did not sustain any fractures; and that Yanitza Morales was hospitalized following the accident,

and suffered a fractured right clavicle and a forehead laceration that required seven stitches.

On March 19, GEICO's general counsel instructed that $20,000—the aggregate-coverage limit—be set aside for a global settlement conference. GEICO also learned that day that State Farm (Carranza's insurer) had decided to tender Martinez the $10,000 individual-coverage limit under Carranza's insurance policy and reserve the remaining $10,000 for a global settlement. And on March 22—thirty-two days after receiving notice of the claim—GEICO informed the SUV Victims that it had tendered the full $20,000 to resolve all claims at the global settlement conference. GEICO also advised the SUV Victims that it had to obtain new counsel "[d]ue to a conflict of representation," and that GEICO's counsel would be in touch to schedule the settlement conference.

In the meantime, GEICO continued to investigate the extent of the SUV Victims' injuries. On March 25, an adjuster spoke with Yanitza and Lisandra Morales's mother, who informed GEICO that she wanted to make sure her daughters' medical bills were paid and that she believed Martinez had suffered the most severe injuries. The adjuster also spoke with Puerto's mother, who said that Puerto was being treated for injuries to her knee. GEICO finally received a letter from the seller of Guevara's truck on April 1, which confirmed that Guevara purchased the truck on the day of the accident, meaning it was covered under her insurance policy.

The global settlement conference was originally scheduled for April 23 but had to be reset due to a scheduling conflict with

Mejia's counsel. On April 16, GEICO received a letter from Michael Olin, Martinez's new attorney, who requested that GEICO provide him with mandatory disclosures pursuant to Fla. Stat. § 627.4137 "within thirty . . . days." GEICO sent him those disclosures within the same day.

The parties held the global settlement conference on April 30. At the conference, GEICO determined that the $20,000 aggregate-coverage limit would be split evenly between Mejia and Martinez, with each receiving the individual-coverage limit. GEICO delivered the tender offers to Mejia and Martinez's respective attorneys with an accompanying release later that day. While Mejia accepted the tender, Martinez's attorney informed GEICO that he "need[ed] to review the file and events since the crash" before determining whether Martinez would accept the offer. GEICO sent Martinez's counsel the requested information two weeks later.

After nearly five months of consideration, Martinez rejected the tender offer on September 23, 2009. In her view, GEICO knew prior to April 30 that Martinez's injuries were far more significant than the policy limits covered, and that Guevara was liable for the accident, indicating that GEICO delayed settlement negotiations in bad faith. Olin would later state that he was interested in pursuing a bad-faith claim on behalf of Martinez from "the very beginning" and that he attended the global settlement conference "to determine whether GEICO had acted in bad faith[.]"

Martinez then sued Guevara, Morina, and Morina's mother (who owned the SUV) for negligence in Florida state court. The

state-court action remained pending for the next eight years. Over that period, Martinez made several demands to settle the case, requesting that GEICO either pay her in excess of the policy limits or allow Guevara to stipulate to an excess final judgment. Although GEICO initially rejected Martinez's settlement proposals, GEICO finally granted Guevara permission to enter into a stipulated final judgment of $2,000,000 on April 2, 2018. The court confirmed the stipulated final judgment award on October 5, 2018. Guevara then assigned to Martinez her right to pursue any claims against GEICO to recover the excess judgment.

On January 19, 2023, Martinez sued GEICO in the U.S. District Court for the Southern District of Florida, alleging one count of bad faith under Florida law. According to Martinez, the delays in investigating and settling the claim amounted to a breach of GEICO's duty of good faith to its insured and caused the $2,000,000 excess judgment to be entered against Guevara. After the close of discovery, GEICO moved for summary judgment, arguing that "no reasonable jury could conclude that GEICO acted in bad faith in its handling of Martinez's bodily injury claim against Guevara." The district court referred that motion to the magistrate judge for a report and recommendation.

The magistrate judge recommended that summary judgment be entered in favor of GEICO, finding that Martinez failed to submit sufficient evidence from which a reasonable jury could infer GEICO's bad faith. Martinez objected to that recommendation. Upon *de novo* review, the district court adopted the report and

recommendation in full and entered final judgment for GEICO.[2] Martinez timely appealed that judgment.

While this appeal was pending, we *sua sponte* raised the issue that Martinez did not adequately plead the citizenship of the parties to establish federal diversity jurisdiction. This prompted Martinez to file a motion for leave to amend her complaint on appeal. We denied that motion and remanded to the district court for the limited purposes of determining the citizenship of the parties and whether diversity jurisdiction existed. On remand, the district court allowed Martinez to amend her complaint by interlineation and found that the amended complaint pleaded sufficient facts to establish diversity jurisdiction. The district court then returned the case to this Court for review on the merits.

## II.    STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment, viewing the evidence and drawing all reasonable inferences in favor of the nonmoving party. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Summary judgment is appropriate when a movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material

---

[2] As the district court adopted the report and recommendation in full, we attribute the reasoning in the magistrate judge's report to the district court, *see* 15A Chas. A Wright & A.R. Miller, *Federal Practice and Procedure* § 3901.1 (3d ed. 2025), and refer to the "district court" when addressing Martinez's challenges to the report.

fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).

### III.    ANALYSIS

The only issue raised in this appeal is whether the district court erred in granting summary judgment to GEICO on Martinez's claim for bad faith.

Florida law "imposes a fiduciary obligation on an insurer to protect its insured from a judgment that exceeds the limits of the insured's policy." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6 (Fla. 2018).[3] "[B]ecause the insured 'has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, . . . the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured.'" *Id.* (quoting *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980)). Under this duty of good faith, insurers generally:

> have obligations to advise the insured of settlement opportunities, to advise as to the probable outcome

---

[3] Although the duty of good faith "is one that the insurer owes to the insured[,] . . . Florida law authorizes a cause of action by which the victim . . . can sue the insurer directly for its bad-faith failure to settle on the insured's behalf." *Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273, 1278 (11th Cir. 2021) (first citing *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980); then citing *Thompson v. Com. Union Ins. Co. of N.Y.*, 250 So. 2d 259, 264 (Fla. 1971)).

> of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid the same, as well as to investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Ilias v. USAA Gen. Indem. Co.*, 61 F.4th 1338, 1344 (11th Cir. 2023) (quotation omitted). These obligations, however, "are not a mere checklist," and "[a]n insurer is not absolved of liability simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment." *Harvey*, 259 So. 3d at 7. Rather, the "critical inquiry" in assessing bad faith is whether, under the "totality of the circumstances," the insurer "diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Id.* (quotation omitted).

To prevail on a bad-faith claim, a plaintiff must prove "(1) bad faith conduct by the insurer, which (2) causes an excess judgment to be entered against the insured." *Ilias*, 61 F.4th at 1344 (citing *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 899 (Fla. 2010)). Florida courts generally treat the existence of bad faith as "a question of fact for the jury." *Campbell v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530 (Fla. 1974) (collecting cases). Summary judgment is appropriate, however, if "there is no sufficient evidence from which any reasonable jury could have concluded that there was bad faith on the part of the insurer." *Eres v. Progressive Am. Ins. Co.*, 998

F.3d 1273, 1278 (11th Cir. 2021) (alteration adopted) (first citing *Boston Old Colony*, 386 So. 2d at 785; then citing *Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1359–60 (11th Cir. 2015)).

On appeal, Martinez advances theories of bad faith based on GEICO's purported delays in investigating the claim and initiating settlement negotiations, as well as its refusal to settle the claim once the state-court litigation had begun. We first address the sufficiency of Martinez's evidence as to each theory. To assuage any concern that we have evaluated GEICO's conduct against a "mere checklist," *Harvey*, 259 So. 3d at 7,[4] we then consider whether that evidence would allow a reasonable jury to infer from the totality of the circumstances that GEICO acted in bad faith.

At the heart of an insurer's duty of good faith is its obligation to "diligently, and with the same haste and precision as if it were in the insured's shoes, work[ ] on the insured's behalf to avoid an excess judgment." *Harvey*, 259 So. 3d at 7. To comply with this duty, an insurer "must investigate the facts . . . and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so." *Id.* (citations omitted).

---

[4] Much of Martinez's opening brief is devoted to criticizing the district court for following a "checklist" approach in its analysis. Such criticism is misplaced. The district court correctly articulated that bad faith is "determined under the totality of the circumstances standard" and drew its conclusions based on the record "as a whole." That it organized its analysis into logical subheadings concerning GEICO's investigation, communications with the insured, and efforts to minimize the likelihood of an excess judgment does not mean that it considered such conduct in a vacuum.

Because investigatory delays can stall the settlement of the claim—thereby increasing the likelihood of an excess judgment against the insured—"[b]ad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991) (citing 46 C.J.S. *Insurance* § 1408 (1946)). And "[w]here liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Id.* (citations omitted).

Here, Martinez argues that GEICO's bad faith can be reasonably inferred from its purported delays in investigating and settling the claim, asserting that GEICO "prioritized the coverage investigation to minimize its own exposure, as opposed to evaluating the potential claims against its insured," and improperly withheld its settlement offer despite knowing the severity of Martinez's injuries. We assess the materiality of these purported delays in investigating and settling the claim in turn, recognizing that each "is merely one factor to be considered" when determining bad faith under the totality of the circumstances. *Id.*

### A.    The Timing of GEICO's Investigation

Martinez argues that GEICO's bad faith can be inferred from its failure to timely investigate the claim, pointing to its delays in receiving the police report and in contacting the SUV Victims once it had obtained the report. Martinez is correct that GEICO did not review the police report for "over two weeks after receiving notice of the crash." But that gap in time alone tells us little about the reasonableness of GEICO's conduct here. *See Clauss v. Fortune*

*Ins. Co.*, 523 So. 2d 1777, 1178 (Fla. 5th DCA 1988). It is undisputed that on February 18—the same day GEICO received notice of the claim—Santini instructed Orive to obtain a copy of the police report. Orive then tasked a field representative with retrieving the report on February 21, and the representative acknowledged the assignment the following business day. By promptly querying the police report, GEICO proceeded with "the same degree of care and diligence" as it would "in the management of his own business." *Boston Old Colony*, 386 So. 2d at 785 (citing *Auto Mut. Indem. Co. v. Shaw*, 184 So. 852 (Fla. 1938)); *cf. Mesa*, 799 F.3d at 1359 (declining to find bad faith where insurer "immediately opened a claim file" upon receiving notice and "[w]ithin four days, . . . hired [a claims administrator] to conduct an investigation and adjust any potential claims").

Moreover, Martinez offers no evidence that could lead a reasonable jury to believe that GEICO "willfull[y]" impeded the field representative's ability to retrieve the report over those two weeks. *Powell*, 584 So. 2d at 14; *see also Harvey*, 259 So. 3d at 9 (finding bad faith where adjuster "was a considerable impediment" to the prompt settlement of the claim). The bare fact of this gap in time may "show some negligence" on GEICO's part—but that is not enough to establish that GEICO delayed its investigation in bad faith. *Eres*, 998 F.3d at 1281. Although an insurer's negligence can be "relevant to the question of [bad] faith," negligence "is not the standard." *Harvey*, 259 So. 3d at 9 (quoting *Boston Old Colony*, 386 So. 2d at 785); *see also DeLaune v. Liberty Mut. Ins. Co.*, 314 So. 2d 601, 603 (Fla. 4th DCA 1975) (While "evidence of negligence may be

16                      Opinion of the Court                    24-10641

considered by the jury as it may bear on the question of bad faith, a cause of action based solely on negligence which does not rise to the level of bad faith does not lie."). We have long recognized that a claim based only on evidence of negligence cannot survive the federal summary-judgment standard.[5] *See Eres*, 998 F.3d at 1281; *Mesa*, 799 F.3d at 1360; *see also Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1155 (11th Cir. 1993) ("Although this is a diversity action and [Florida] state law therefore provides the controlling

---

[5] *Harvey* does not (and cannot) abrogate this federal procedural rule. When *Harvey* was decided, "Florida place[d] a higher burden [than federal courts] on a party moving for summary judgment," *Harvey*, 259 So. 3d at 10 n.2, requiring the movant to "show conclusively that no material issues remain for trial," *Visingardi v. Tirone*, 193 So. 2d 601, 604 (Fla. 1966); *see also In re Amends. to Fla. Rule of Civ. Proc. 1.510* (*In re Amends. II*), 317 So. 3d 72, 75–76 (Fla. 2021) (later amending Florida Rule of Civil Procedure 1.510 to conform with federal summary-judgment standard). *Harvey* explicitly recognized that "federal case[s], . . . 'to the extent . . . [they] permit summary judgment based on Federal Rule of Civil Procedure 56 . . . are of limited precedential value in Florida summary judgment cases'" adjudicated in state court precisely because we applied a more movant-friendly standard. *Harvey*, 259 So. 3d at 10 n.2 (alteration adopted) (quoting *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 923–24 (Fla. 4th DCA 2007)). Accordingly, while evidence of negligence might be enough to yield a triable issue in state court, it is insufficient to create the "inference of bad faith" required to survive summary judgment under Rule 56. *Eres*, 998 F.3d at 1281.

Moreover, now that the Florida Supreme Court has adopted the federal summary judgment standard as the standard for Florida state summary judgment proceedings, *In re Amends. to Fla. Rule of Civ. Pro. 1.510* (*In re Amends. I*), 309 So. 3d 192 (Fla. 2020), and subsequently adopted the text of the federal summary judgment rule itself as Florida's rule, *In re Amends. II*, 317 So. 3d at 72, we are doubtful that the distinction drawn by *Harvey* remains viable.

substantive law, federal law governs the sufficiency of the evidence necessary to preclude a grant of summary judgment." (citations omitted)).  Therefore, GEICO's delay in obtaining the police report cannot alone sustain a finding of bad faith.

Martinez also faults GEICO for not contacting the SUV Victims sooner after receiving the police report, maintaining that GEICO initially focused on the coverage investigation "to protect its own interests."  But she fails to offer any competent evidence to support that inference as well.  Given an insurer's dual mandate to act with both ordinary "care *and* diligence," *Harvey*, 259 So. 3d at 9 (emphasis added), an insurer is allowed "to make a reasonable evaluation of the case" before making a settlement offer.  *DeLaune*, 314 So. 2d at 602; *see also Boston Old Colony*, 386 So. 2d at 785 (noting insurer's duty includes obligation to "investigate the facts").  And where, as here, coverage is disputed, the insurer is also allowed reasonable time "to make a thorough investigation to determine whether there is coverage under its policy of insurance."  *Caldwell v. Allstate Ins. Co.*, 453 So. 2d 1187, 1191 (Fla. 1st DCA 1984).

GEICO, upon realizing that Guevara's truck may not have been covered by her policy, was required to "resolve the coverage dispute promptly or in such a way as to limit any potential prejudice" to her.  *Pozzi Window Co. v. Auto-Owners Ins.*, 446 F.3d 1178, 1188 (11th Cir. 2006) (quoting *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 63 (Fla. 1995)).  Within the first few weeks of the investigation, GEICO took several steps to assess coverage, including instructing its claim adjuster to procure the bill of sale for the

truck, speaking to Guevara's partner about when she purchased the truck, and querying the truck's registration on a vehicle database. When those efforts failed to provide a clear answer as to the truck's ownership, GEICO took the additional step of requesting proof of purchase from Guevara's attorney. And—despite having not yet received either the bill of sale or the proof of purchase it requested—GEICO elected to set aside the aggregate-coverage limit for settlement negotiations on March 19, which was thirty days after receiving notice of the claim and identifying the coverage issue.

We recognize, of course, that "each bad faith case 'is determined on its own facts.'" *Harvey*, 259 So. 3d at 8 (quoting *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004)). But here, the undisputed facts show that GEICO pursued its investigation with the requisite "diligence and thoroughness," *Am. Builders Ins. Co. v. S.-Owners Ins. Co.*, 71 F.4th 847, 856 (11th Cir. 2023) (quotation omitted), by promptly making a settlement offer even when coverage remained uncertain, *see Pozzi*, 446 F.3d at 1188 (noting that "efforts made by the insurer to settle the liability claim in the face of the coverage dispute" undercut a finding of bad faith). We cannot say GEICO failed to act "with due regard for the interests of the insured" by putting Guevara's interest in reaching a settlement above its own incentive to avoid paying out potentially uncovered claims. *Boston Old Colony*, 386 So. 2d at 785 (citing *Liberty Mut. Ins. Co. v. Davis*, 412 F.2d 475 (5th Cir. 1969)).

Resisting this conclusion, Martinez argues that a jury could nonetheless infer bad faith from GEICO's investigatory delays

because GEICO violated its internal policy to "contact the claimant, or a member of his or her family, as soon as possible after the assignment unless circumstances make it impossible." Such conduct, however, is not enough to show bad faith as a matter of law. Though "Florida law . . . recognizes that the violation of a party's internal policies can be evidence of its negligence," *50 State Sec. Serv., Inc. v. Giangrandi*, 132 So. 3d 1128, 1134 (Fla. 3d DCA 2013) (citations omitted), negligence, as we have said, "is not the standard," *Pelaez v. Gov't Emps. Ins. Co.*, 13 F.4th 1243, 1251 (11th Cir. 2021) (quoting *Harvey*, 259 So. 3d at 9), and a bad-faith claim "cannot be sustained [solely] upon the theory of negligence," *Am. Fidelity & Cas. Co. v. Greyhound Corp.*, 232 F.2d 89, 93 (5th Cir. 1956) (Tuttle, J.) (quoting *Auto Mut. Indem. Co. v. Shaw*, 184 So. 852, 859 (Fla. 1938)). Since Martinez has flagged no additional evidence on the extent to which GEICO's own policies reflect the standard of "care and prudence" it owes to its insured, *Boston Old Colony*, 386 So. 2d at 785; *cf. L.A. Fitness Int'l, LLC v. Mayer*, 980 So. 2d 550, 558 (Fla. 4th DCA 2008) (noting "the custom and practice of an industry can help define a standard of care a party must exercise"), a reasonable jury would have no basis to infer bad faith from GEICO's noncompliance with its own timing policies, even if we assume that noncompliance was negligent. Martinez has therefore not met her summary-judgment burden of "show[ing] that a genuine issue remains for trial" on this issue. *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (first citing Fed. R. Civ. P. 56(e); then citing *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)).

20                    Opinion of the Court                    24-10641

### B.  The Timing of GEICO's Settlement Offer

Martinez also contends that GEICO's bad faith can be inferred from its purported delay in initiating settlement negotiations.  Specifically, Martinez asserts that GEICO acted in bad faith by failing to tender the $20,000 aggregate-coverage limit for a global settlement before March 22, 2009, and by not offering her the $10,000 individual-coverage limit before the global settlement conference.  Recall that "[w]here liability is clear, and injuries [are] so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Powell*, 584 So. 2d at 14.  That is because, under such circumstances, "the financial exposure to the insured acts as a 'ticking financial time bomb' and '[a]ny delay in making an offer . . . even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith.'"  *Kinsale Ins. Co. v. Pride of St. Lucie Lodge 1189, Inc.*, 135 F.4th 961, 969 (11th Cir. 2025) (quoting *Goheagan v. Am. Vehicle Ins. Co.*, 107 So. 3d 433, 439 (Fla. 4th DCA 2012)).

Here, Martinez has submitted competent evidence demonstrating that GEICO knew early on it was likely the damages sustained from the crash would exceed the policy limits: GEICO learned on the same day it received notice of the claim that there were six people in Morina's SUV—two of whom had to be airlifted to the hospital—and promptly advised Guevara "of the possibility of claims exceeding the applicable coverage limits."  As such, GEICO's affirmative duty to initiate settlement discussions at that time turns on whether a reasonable jury could also find that

liability was clear "based on what the insurer knew at the time, as well as what the insurer reasonably should have known." *Kinsale*, 135 F.4th at 969 (citing *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1545 (11th Cir. 1991)).

In *Kinsale*, we explained that when referencing "clear liability" "Florida's courts have provided guidance about the meaning of the word 'clear' by using the synonym 'obvious.'" *Id.* (first citing *Powell*, 584 So. 2d at 14; then citing *Goheagan*, 107 So. 3d at 438). To construe those terms, we referenced numerous dictionary definitions—ranging from "easily discovered, seen, or understood" to "plain and evident to the mind; perfectly clear or manifest; plainly distinguishable; clearly visible," *id.* at 969–70 (alteration adopted) (first quoting *Obvious*, *Merriam-Webster Dictionary*, https://perma.cc/E7L4-A2SY; then quoting *Obvious*, *Oxford English Dictionary*, https://www.oed.com/dictionary/obvious_adj)—and situated those definitions among "fact patterns" from Florida cases "where liability could be described as obvious," such as where the insured "was intoxicated," "was evaluated at '80-100%' liability," or ran a stop sign, *id.* at 970 (first citing *Berges*, 896 So. 2d at 669, 681; then citing *Goheagan*, 107 So. 3d at 436, 439; then citing *Powell*, 584 So. 2d at 13; and then citing *Robinson v. State Farm Fire & Cas. Co.*, 583 So. 2d 1063, 1064, 1069 (Fla. 5th DCA 1991)). And we clarified that we did not "understand the question to be whether the insured's liability is 100% guaranteed," but rather whether a jury could "reasonably find" that liability was clear.

*Kinsale* is instructive on this standard's application as well. There, the majority ultimately rejected the insurer's argument that "evidence uncovered during the investigation made liability unclear as a matter of law" because each of the insurer's bases for challenging liability—i.e., the location and timing of the incident, a lack of causation, and that the victim had been consuming alcohol—was either "directly contradicted" by record evidence or immaterial under Florida premises-liability law. *Id.* at 974–75. Once those factual disputes were resolved in favor of the insured, the court determined that a jury could "reasonably find that liability was clear" under that view of the evidence. *Id.* at 972–75.

Our case materially differs from *Kinsale* because *Kinsale* does not present the same coverage issue GEICO faced here. When an insurer faces both "an affirmative duty to offer settlement" and a coverage issue, it still must be allowed some opportunity "to resolve the coverage dispute promptly" or with the requisite "diligence and thoroughness." *Am. Builders*, 71 F.4th at 856 (quoting *Pozzi*, 446 F.3d at 1188). Otherwise, the insurer would be placed in the "illogical and unfair . . . position of either paying what it believes to be an uncovered claim or being in jeopardy of a bad faith judgment for failure to pay a claim." *Higgins v. State Farm Fire & Cas. Co.*, 894 So. 2d 5, 15 (Fla. 2004) (internal quotation omitted). As we already said, GEICO pursued its coverage investigation diligently and in good faith, making its settlement tender even before receiving documentation regarding Guevara's ownership of the truck.

24-10641               Opinion of the Court                 23

Moreover, we cannot say that Guevara's liability was "free from obscurity or ambiguity" even upon accepting Martinez's account of the crash. *Kinsale*, 135 F.4th at 970 (quotation omitted). It is undisputed that GEICO fielded conflicting opinions as to liability for the multi-car crash including that Morina and not Guevara was responsible for the accident. GEICO was thus allowed "to make a reasonable evaluation" of liability before making a settlement offer. *DeLaune*, 314 So. 2d at 603. Martinez's argument that GEICO delayed its tender of the aggregate-policy limit in bad faith thus fails.

Alternatively, Martinez attacks the propriety of the global settlement conference itself. In her view, GEICO acted in bad faith by waiting until the global settlement conference to tender her the $10,000 individual-coverage limit, since GEICO knew long before then that Martinez "had suffered greater injuries than everyone else in the accident combined." Given GEICO's conversations with the SUV Victims and their family members, a jury could reasonably infer that GEICO knew prior to the April 30 settlement conference that Martinez's injuries were among the most severe. But that does not mean GEICO was obligated to tender Martinez the individual-coverage limit beforehand.

When faced with multiple claimants, an insurer has no obligation to immediately pay out the policy limit to the most-injured party. *See Mesa*, 799 F.3d at 1360. In fact, the duty of good faith prohibits the insurer from "indiscriminately settling selected claims and leaving the insured at risk of excess judgments that could have been minimized by wiser settlement practice," and leaves how to

best approach "settlement and defense with regard to the multiple claims" to the reasonable discretion of the insurer.  *Farinas v. Fla. Farm Bureau Gen. Ins. Co.*, 850 So. 2d 555, 560–61 (Fla. 4th DCA 2003)); *see also Harmon v. State Farm Mut. Auto. Ins. Co.*, 232 So. 2d 206, 207–08 (Fla. 2d DCA 1970) (finding global-settlement conference to be a reasonable strategy for settling multiple claims).  Thus, by withholding its distribution of the policy limits until the global settlement conference, GEICO actually furthered its insured's best interests by structuring a settlement plan that would "minimize the magnitude of possible excess judgments" against her.  *Farinas*, 850 So. 2d at 561.

Parrying, Martinez contends that the reasonableness of the global settlement conference is undercut by our opinion in *Ilias*, a case in which we rejected an insurer's argument that "its delay in tendering the policy was justified because [the plaintiff's] claim was not the only one arising out of the accident."  *Ilias*, 61 F.4th at 1346. But we did so only as a factual matter, not a rule of law: the insurer in *Ilias* did not offer any evidence to indicate that anyone besides the plaintiff was pursuing compensation for bodily injury.  *Id.*  Here, by contrast, the undisputed evidence shows there were "seven potential claims" arising from the accident, with six victims ultimately participating in the global settlement conference.  Unlike the insurer in *Ilias*, GEICO clearly had a reasonable basis to believe it needed "to get everyone in a room to see if [it] could settle all the claims" in order to avoid an excess judgment.  *Farinas*, 850 So. 2d at 561.  Accordingly, GEICO's decision to withhold tendering the policy limits until the global settlement conference provides no

indication that it acted in bad faith.  The undisputed record demonstrates that GEICO's decision to delay tendering Martinez's individual-coverage limit until the global settlement conference was both reasonable and consistent with its duty to the insured.  Martinez has thus failed to substantiate her claim of bad faith based on the timing of GEICO's settlement offer.  We now address GEICO's post-offer conduct.

### C. GEICO's Post-Offer Conduct

Martinez also argues that bad faith can be found in GEICO's alleged "failure to consider, communicate, explain, negotiate, permit, or accept" her post-litigation settlement offers.  The duty of good faith generally extends to an insurer's "entire conduct in the handling of the claim," including during the derivative litigation against the insured.  *Berges*, 896 So. 2d at 672.  However, an insurer's obligation to "'give fair consideration to a settlement offer that is not unreasonable under the facts' . . . [ends] '[o]nce it [is] clear that [the claimant] [is] unwilling to settle'" within the policy limits and agree to a full release.  *Contreras v. U.S. Sec. Ins. Co.*, 927 So. 2d. 16, 21 (Fla. 4th DCA 2006) (quoting *Boston Old Colony*, 386 So. 2d at 785); *see also Kropilak v. 21st Century Ins. Co.*, 806 F.3d 1062, 1070 (11th Cir. 2015) ("[A]n insurer owes . . . no duty to its insured to enter into a consent judgment in excess of the limits of its policy.").

Martinez concedes that GEICO was not "required to enter into any agreement" with her after she rejected the tender offer.  She nonetheless maintains that GEICO's failure to consider her offers or "explain to its insured its reasons for rejecting them"

26                    Opinion of the Court                24-10641

constitutes "admissible evidence" of bad faith that a jury may consider as part of the totality of the circumstances.  But while such evidence may be "relevant to the question of [bad] faith" and admissible at trial, *Boston Old Colony*, 386 So. 2d at 785; *cf.* Fed. R. Evid. 401, without more, it is insufficient as a matter of Florida law to establish that GEICO's "actions rose to the level of bad faith," *see Mesa*, 799 F.3d at 1360.  Seeing that Martinez raises no other competent evidence indicating that GEICO's post-tender conduct amounted to bad faith, we conclude that no reasonable jury could make that inference on this record.  Because GEICO was not required to settle outside the policy limits, and did not otherwise act in bad faith once the state litigation began, this circumstance cannot sustain Martinez's claim as a matter of law.

### D. The Totality of the Circumstances

We now consider whether a reasonable jury could infer that GEICO "failed to act in good faith with due regard for the interests of the insured" under the "totality of the circumstances." *Harvey*, 259 So. 3d at 7 (internal quotations omitted).  Viewing the record and drawing all reasonable inferences in favor of Martinez, we conclude that Martinez has failed to submit sufficient evidence of bad faith as to any of the "circumstances to be weighed by the fact-finder." *Kinsale*, 135 F.4th at 969 n.1 (quoting *Powell*, 584 So. 2d at 13).

On these facts, GEICO's conduct in investigating the claim, initiating settlement negotiations, and refusing to settle for above the policy limit fail to evince bad faith as a matter of law.  And while

evidence of GEICO's negligence in obtaining the police report and contacting the claimants in violation of its own policies, as well as its rejection of Martinez's counteroffers, are "relevant to the question of [bad] faith," *Boston Old Colony*, 386 So. 2d at 785, those circumstances, even taken together, do not create an "inference of bad faith," *Eres*, 998 F.3d at 1281; *see also Harvey*, 259 So. 3d at 9 ("[N]egligence is not the standard.")—and therefore are necessarily insufficient to overcome summary judgment under our federal standard. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Even under a totality-of-the-circumstances standard, no triable issue remains when "[t]here is no sufficient evidence from which any reasonable jury could have concluded that there was bad faith on the part of the insurer." *Boston Old Colony*, 386 So. 2d at 785. So too here.

In a final effort to save her claim, Martinez falls back on the deposition testimony of her "claim-handling expert," Lewis Jack, which she asserts the district court erroneously "refused to even consider" in evaluating the totality of the circumstances. Jack, an insurance lawyer, testified on several aspects of the claim process, including the timing of the tender, the propriety of the global settlement, and GEICO's post-offer conduct. For example, Jack testified that GEICO "violated its duty of good faith and fair dealing regarding Kathy Martinez's claim against GEICO's insured, Diana Guevara, by improperly delaying its tender of its bodily injury liability limits of $10,000 until April 30, 2009." He also opined that

GEICO's decision to hold a global settlement conference and post-offer conduct was "inconsistent with" its duty of good faith.

Jack's statement that "GEICO violated its duty of good faith" is nothing more than a conclusory allegation, and thus lacks any probative value at summary judgment. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986–87 (11th Cir. 1985); *see also Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 672–73 (D.C. Cir. 1977) (noting Federal Rule of Evidence 703 "was not intended . . . to make summary judgment impossible whenever a party has produced an expert to support its position"). Moreover, whatever Jack's views on the "legal implications" of GEICO's conduct are, they cannot displace this Court's conclusion that neither the manner of settlement nor GEICO's refusal to settle beyond the policy limit evinces bad faith as a matter of law. *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128 (11th Cir. 2018) (quoting *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990)); *cf. Montgomery*, 898 F.2d at 1541 ("[The expert] testified that in his opinion [the insurer] had a duty to hire tax counsel in this case. This was a legal conclusion, and therefore should not have been admitted." (internal citation omitted)). As such, we conclude that Martinez has not identified any "competent" evidence from Jack's testimony suggesting bad faith.

Based on the totality of the circumstances, no reasonable jury could conclude that GEICO acted in bad faith in handling Guevara's insurance claim. Since "no reasonable jury could find bad faith" on these facts, Martinez's bad-faith claim fails as a matter of

law. *Eres*, 988 F.3d at 1277.  We thus conclude that the district court did not err in concluding GEICO was entitled to summary judgment.

## IV.    CONCLUSION

For the reasons stated, we affirm the district court's entry of summary judgment for the Defendant GEICO.

**AFFIRMED.**